Curia, per

Withers, J.
The first question is, whether copies of deeds of lease and release from the record office in Charleston were legitimate evidence for the plaintiffs. If the originals were properly recorded in that office, the said copies were admissible under the Act of 1843, touching such evidence.
It is to be assumed that the land conveyed by those deeds was situate in the county called .Winton at the' date of them, though the same is described as lying in the district of Orangeburg.
By an Act passed the 12th of March, 1785, (4 Stat. 664,) the *525 county of Winton was designated by boundaries, and was carved out of the district of Orangeburg. By Act of 22d March, 1786, (7 Stat. 244,) the upper line of Winton was readjusted.
That county came under the provisions of what is commonly called the County Court Act, of date March 24th, ,1785. The Act passed 12 days before, which partitioned the whole State into counties, (mainly for the benefit of county courts, which were then pronounced to have proved themselves very useful,) charged the-county court Judges with the duty of causing to be erected all necessary public-buildings for the use of the courts, and they were enjoined to select a site most convenient to the inhabitants of each county, upon which two-thirds of. the Judges were to agree, and in case of any partiality the people were to be redressed by an appeal to the' Governor and Council. The ways and means were to be derived from taxes levied by authority of the county court, the collection whereof was enforceable in manner as those levied for the direct use of the State. Such was the state of affairs in Winton county on the 12th March, 1785.
The deeds, copies, of which were received in evidence, bore date 13th and 14th. July, 1786. The first county court held for Winton was on the 17th October, 1786. The bond of the clerk of that court,- as recorded in a book yet in existence, was dated 18th October, 1786. Some minutes appear as of October of the same year — and the first registration of a deed there appearing is of date January, 1787.
The date of plaintiffs’s deeds, therefore, is something more than three months anterior to the earliest organization of the county court for Winton, and the qualification of a clerk and register. By a clause in the County Court Act, such .deeds were required to be recorded, within 6 months, in the register’s office of the county where the land was situate, and the probate was required to be before county court Judges. Notwithstanding this general provision of the registry law, it cannot be. a sound construction to hold that it required an impossibility. Twining, when he received his deeds, could not conform to it. At that time, Winton, judicially considered, was in embryo — when the *526 judges for it were appointed, does not appear — what space of time they would occupy in organizing it completely, Twining could have no means of knowing — he could not foresee that this would be accomplished within the 6 months allowed him for recording — the register was required to keep his office at the court-house, the judges to sit there, and probate made before them — and although the event proved that a session was holden before the 6 months expired, it seems probable that the courthouse was not completed within that time, from the date of the deeds, and we ought not to assume that Twining, in the circumstances of his case, having a right and an interest to record his deeds forthwith, should anticipate the practicability of making probate, and of registering them at Winton, within the time prescribed. This Court concludes, from such considerations, that the registry of the said conveyances was properly made in Charleston, and that copies were therefore admissible under the Act of 1843.
Although registers were to be appointed for each district by the constitution of 1778, it does not appear that any was appointed for Orangeburg while Winton was a part of it — nor does the revocation of the office of register for Orangeburg district, by Act of 1791, furnish any evidence that the office itself existed before Winton county was cut out by Act of 1785, or at the date of the deeds.
The question of far more importance is that which arises from the title claimed for defendants, by reason of adverse possession, which (it was admitted) had become effectual to bar the right of entry on the part of plaintiff’s wife, if she had been exclusively seized. When Twining died, in 1818, the land descended to a grand-daughter, (Talbot,) born in 1807, and Mrs. Hill, the co-plaintiff here, who was bom in 1818, in the month following next after her father’s death. Mrs. Hill’s right of entry continued unimpaired up to February, 1844. Her niece (once Miss Talbot, but who had become Mrs. Lamar,) died in November, 1833, leaving children some of whom are yet minors; so that although, by several descents cast, different persons had become tenants in *527 common with Mrs. Hill, and, as such, seized with her of the fee, the disability of minority, on the part of some tenant in common seized of the fee, had existed continuously from the death of Twining to the present day. No minor co-tenant is a co-plain-tiif with Mrs. Hill.
The question is, can she avail herself of the disabilities that have existed, and which will be comprehended from the foregoing statement, in manner following, to wit: by casting the protection of her own minority over Mrs. Lamar’s right of entry up to the death of the latter in 1833 (who would otherwise have been barred in March of that year); and then by borrowing the protection of the minority of Mrs. Lamar’s children, which has existed thenceforth ?
The opinion of a majority of us is, that this question is concluded, in favor of these plaintiffs, by a current of decision in this Court. It begins with Gourdine vs. Theus, 1 Brev. 326, is traced to Lahiffe vs. Smart, 1 Bail. 192, (when it was said the doctrine had been recognized five and twenty years,) to Thomson vs. Gaillard, 3 Rich. 418 (in 1832); and is fully recognized in Henry vs. Means, 2 Hill, 328 (in 1834). This last case related to personalty, and is contrary to that of Gourdine vs. Graham, (1 Brev. 329,) which was, perhaps, unknown to the Court that decided the case of Henry vs. Means. We do not mean, however, to shake in the least the latter case by the foregoing observation.
It is suggested that there our rule, on this point, should be confined, at any rate, to an estate in joint tenancy, in its technical sense, and that its application to one of tenancy in common was inadvertent. The first case (Gourdine vs. Theus,) where the doctrine was adjudged, was undoubtedly a tenancy in common. The land then in question had become disburthened of all the trusts of a marriage settlement, the limitations therein created having become totally exhausted, and it had descended, by intestacy, to the next of kin, collateral, of the first tenant in fee. Now no estate in joint tenancy can exist, except by purchase. It never can arise by descent cast. What may have *528 been the nature of the estate protected by a minority in the case of Lahiffe vs. Smart, does not sufficiently appear from the report, but the defendants contended they had become tenants in common with the infant. Whether that had arisen out of-the destruction of a joint tenancy, we cannot now say.
In those Courts, however, which hold a doctrine contrary to ours, an estate in joint tenancy derives no peculiar favor from the minority of one tenant, but rather the reverse, upon the principle that each is seized of an undivided moiety of the whole, and not of the whole of an undivided moiety; insomuch that, by Stat. 3 & 4 W. IY. c. 27, sec. 12, the possession of one joint tenant, tenant in common or co-parcener, is not to be regarded as the possession of another, and this for the purpose of preventing the statute of limitations from running against them. Tide Crabbe, sec. 2305.
We are not without an example of what is considered a peculiarity in this case — and what has been called in the argument cross protection, for so was the case of Thomson vs. Gaillard. But we probably have no case in which the protection of minority in a co-tenant has been adjudged to save the right of the other, which latter sues alone, and does not join the minor co-tenant. Our first case (Gourdine vs. Theus) was this: — Gour-dine derived title from four females, who had acquired the land as “ co-heiresses” (to use the language of the case) of Margaret O’Neal, the title of three of whom had been saved against adverse possession by the minority of the fourth. He recovered the whole land. We may suppose that he would have been confined to the portion of the minor if the doctrine of Lord Mansfield in Roe vs. Rowlston, (2 Taunt. 441) had prevailed— for, in such a case, the plaintiff was allowed to recover only the moiety of the minor parcener. On the other hand, we have cases to the effect, that when a joint action is brought by two, and one only can plead the protection of minority, it shall avail neither (vide Marsteller vs. McLean, 7 Cran. 156 — founded on Perry vs. Jackson, 4 T. R. 516). Those who hold that joint tenants must sue jointly, and also hold the doctrine last adverted *529 to, impale them upon one or other horn of a dilemma — and we have already seen that they have been relieved from the hard necessity, in England, by statute. In cases of coparcenary, or tenancy in common, each has been allowed, to bring his several action, and such ds our rule.
The doctrine established by our cases hereinbefore cited, we think may be rested upon the following legal considerations:— A title to land from the State, draws with it to the grantee the seizen, or actual legal possession. The grantee is, therefore, in possession until he be ousted by some one actually entering, and holding adversely, that is to say, as of right, from which time the statute begins to run in favor of such actual possession, and upon the determination of the statutory period, the grantee is disseized or barred of his right of entry — that is, in one sense, he cannot recover the possession at law, though he may establish a title. It may be conceived that the disseizor has invested himself with the right or title of the true owner, when his possession has manifested the true characteristics of adverse occupation. What are those characteristics ? They appear to be well set forth in Hawk vs. Senseman, (6 S. & R. 21) to wit, an adverse possession must be “an actual, continued, visible, notorious, distinct and hostile possession.” There is, perhaps, not a 'word of surplusage in this definition. The substratum of it is, that the owner, who is thus to be ousted, shall, by the nature of the possession, have notice of the infringement of his right, of the fact of infringement, and the definite extent of it. Now conceive the true owners to be co-tenants — neither having actual possession, and one of whom, during the whole course of the presumed adverse possession, is á minor. Against him there can be no adverse possession. No laches can be imputed to him— he is presumed not to be cognizant of his rights, nor of the necessity and mode of vindicating them — and this by the general law. No designated specified acre belongs to the adult — nor any one to the minor. Now where is the “distinct, visible” line of demarcation, according to which the adult co-tenant is ousted? Take any acre in the whole tract, even if the adverse *530 possession is assumed to be co-extensive with the whole, and has not the minor an undivided interest in it? It is tobe remembered that one co-tenant cannot sue another without actual ouster. So his possession can never be adverse until it shall grow out of such ouster. Neither, in the case supposed and that now before us, is in possession actually. Yet if the defendants in this case have held adversely against the plaintiffs, and are clothed with Mrs. Hill’s seizin or title,, they have effected an ouster of them, and, nolens volens, have become co-tenants with a minor — and this by adverse possession, which has not designated a single acre as exclusively their own. It is not an apt answer to say, the inference arises that the defendants have acquired the title of Mrs. Hill, which is the case where the lapse of twenty years presumes a grant or deed. The true view of the protection derived from adverse possession seems rather to be not that it implies the acquisition of title, but that it bars the assertion of title by the legal owner. Nor does it follow that any interest in land, which one may sell, another can acquire by adverse use; for though he, in remainder or reversion, might join the tenant for life in granting an easement over the locus in quo, yet adverse enjoyment of it, while tenant for life is in possession, will not bind the owner of the absolute fee, according to the doctrine of the English courts, in applying the Stat. 2 & 3 W. IV, c. 71, for shortening the time of prescription. They hold thptt such a right, which is also based on adverse use, if acquired at all, must be absolute against all the world. The cases are cited by Best on Presumptions, while treating of the said statute.
If these suggestions be well founded, it would seem that the user or possession of the defendants has been wanting, as against these plaintiffs, in one or more of the essential qualities of an adverse use or possession, according to its true import. If so, then these plaintiffs were not thereby divested of their seizin, and, therefore, are not defeated by omitting to join with them the minor tenants in common. At any rate we cannot withdraw the present cause from the principle that rules the like case preceding it.
*531 That such succession of minorities, re-acting on each other, may operate inconveniently, and somewhat adversely to the policy of statutes of limitation, is a consideration that affected Lord Mansfield in Roe vs. Rowlston, and various American courts. It probably produced the reluctance acknowledged, by our own Court, in Lahiffe vs. Smart, in yielding to the rule which was then said to have prevailed so long, and it was likewise distinctly in the mind of the Court in Thomson vs. Guillard. That there¿is force in the consideration, we do not deny. The same has been conceded on prior occasions. But we cannot, on that account, undertake to expunge a rule that has taken such deep root in our jurisprudence.
The motion is refused.
O’Neall, Frost and WhitNer, JJ. concurred.